IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

JOY COHRS,                                    )
                                              )
                    Plaintiff,                )        Case No. 03-505-KI
                                              )        **LEAD CASE**
          vs.                                 )
                                              )        OPINION
SALOMON SMITH BARNEY, INC. and                )
CITIGROUP GLOBAL MARKETS, INC.,               )
                                              )
                    Defendants.               )
                                              )
_____      )
                                              )
DAVE STAHLY and MEL DAVIS,                    )        Case No. 03-506-KI
                                              )
                    Plaintiffs,               )
                                              )
          vs.                                 )
                                              )
SALOMON SMITH BARNEY, INC. and                )
CITIGROUP GLOBAL MARKETS, INC.,               )
                                              )
                    Defendants.               )
                                              )
_____      )

Stephen F. English
David R. Foster
Thomas L. Hutchison
Bullivant Houser Bailey PC
300 Pioneer Tower
888 S. W. Fifth Avenue
Portland, Oregon  97204-2089

       Attorneys for Plaintiffs

Gilbert R. Serota
Ceide Zapparoni
Jason M. Habermeyer
Howard, Rice, Nemerovski, Canady, Falk
& Rabkin, P.C.
Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4024

Steven K. Blackhurst
Ater Wynne LLP
222 S. W. Columbia, Suite 1800
Portland, Oregon  97201-6618

       Attorneys for Defendants

KING, Judge:

Plaintiffs, trustees of union employee benefit plans (collectively, "Plans") for the United Association Local No. 290 Plumber, Steamfitter & Shipfitter Industry, bring this action against the Plans' professional investment consultant, Salomon Smith Barney, Inc. ("SSB") and Citigroup Global Markets, Inc., the new name for SSB as of April 2003.[1]  Plaintiffs allege that SSB failed to provide adequate services to the Plans and contributed to the Plans' losses in excess of $71 million due to investments with Capital Consultants, LLC ("CCL").  Before the court are SSB's Motion for Summary Judgment or, alternatively, Motion for Partial Summary

---

[1] All references to SSB will refer also to Citigroup Global Markets, Inc.

Judgment (#161), Plaintiffs' Motion for Partial Summary Judgment re SSB's Status as an ERISA Fiduciary (#170), and some related motions. For the reasons below, I grant summary judgment in favor of SSB and dismiss all of plaintiffs' claims.[2]

## FACTS

I.    <u>The Parties</u>

Local 290 had a Pension Plan and, after 1994, and a 401(k) Plan which are both employee benefit plans governed by the Employee Retirement Income Security Act ("ERISA"). Trustees at the time included Chairman Jerry Fullman, Matt Walters, Ed Gormley, Nick Scovill, Paul Clendenin, Lyman Warnock, and Dave Stahly. The trustees to the two Plans overlapped to a great extent. Mort Zalutsky provided legal services to the Plans. Dick Layne served as the auditor.

The Plans used three investment managers: CCL, Quest Investment, and McMorgan & Company. CCL was an investment manager to the Local 290 Pension Plan since the early 1970s and became the investment manager of the Local 290 401(k) Plan when it began in 1994. CCL's agreement with both the Pension Plan and the 401(k) Plan gave it full discretion to invest the Plan's assets, including both public-traded securities and private investments, within the Plans' investment guidelines.

---

[2] I previously consolidated two cases: <u>Cohrs v. SSB</u>, CV03-505-KI, and <u>Stahly v. SSB</u>, CV03-506-KI. <u>Cohrs</u> settled and I entered a Stipulated Order of Dismissal with Prejudice for the claims alleged there. This Opinion only covers <u>Stahly</u> and the claims alleged within it.

II.    <u>The Relationship</u>

On October 10, 1989, Casey Scott proposed that the Pension Plan retain SSB[3] as a consultant.  Scott discussed the "range of consulting services which can be utilized by clients," including:  (1) establishing or revising the consensus philosophy for investment management; (2) asset allocation analysis; (3) determining the investment perspective to market volatility; (4) determining if the past investment performance achieved the Plan's goals and objectives; and (5) performance measurement.  Hutchinson Decl. Ex. 2.

In 1990, the Pension Plan trustees ratified the decision to retain SSB as the fund's investment performance analyst, as described in the minutes.  Scott was the first SSB financial consultant assigned to the Plans.  He was replaced in 1994 by Bonnie Haslett and Bill Chambers.  The initial fee was $12,500 annually.  SSB provided quarterly written reports and attended some of the trustees' meetings.

On September 10, 1994, Chambers sent a form letter to Scott's former clients to introduce himself and Haslett and ask the clients to stay with SSB.  He also stated, "In dealing with Retirement Plans subject to ERISA you and our other clients have become very comfortable knowing that in our Fiduciary Services program [SSB] acknowledges in writing it's [sic] CO-Fiduciary Status with you."  Hutchinson Decl. Ex. 56.

In 1994, Chambers thought the trustees were not fulfilling their duty by failing to have a monitor on the two-thirds of CCL's portfolio that was in private investments.  He gave the trustees an article from the Department of Labor showing actions against other trusts and

---

[3]  Actually he proposed SSB's predecessor, Shearson Lehman Hutton.  SSB has several predecessors during the ten years at issue here.  I will only note the differences if they are relevant to the analysis.

encouraged the trustees to get someone else to monitor the private investments.  Chambers Dep. at 316.

The third quarter 1994 report contains two pages the parties have termed the "Lewis and Clark document."  The first page states, "Lewis and Clark Knew How to Paddle a Canoe, They Knew Which Direction Was West, Still They Hired Sacagawea, a Consultant" (with commas added for clarity).  The second page asks, "What should you expect from an Investment Management Consultant?"  It then lists several goals and objectives under the categories of independence, communicative, and resources.  A few examples are:  (1) "Your Consultant should have as it's [sic] only objective to serve you, the client;" (2) "The Consulting firm should have an annual budget which allows ample research and development effort;" and (3) "The data base utilized to search for new investment manager candidates should be extensive and audited regularly to ensure accuracy and integrity."  Hutchinson Decl. Ex. 30.

SSB's Consulting Group has five levels of service available with progressively higher fees.  Level I provides assistance with statements of investment policy guidelines, strategic policy allocation studies, quarterly investment performance measurement reports, manager searches, and optional custody.  Level V is discretionary investment advisory services, titled fiduciary asset management.  Hutchinson Decl. Ex. 64.  Consulting Group executive Brian Ward testified that part of the Lewis and Clark document, particularly the manager research, describes some of the components of service at Level III and Level IV.

The Plans executed Consulting Group Institutional Services Agreements which are identical except for the compensation provision:

Under this agreement, effective March 31, 1999 Consulting Group, a division of Salomon Smith Barney Inc. (SSB) shall:

– Assist the United Association Union Local No. 290 Plumber, Steamfitter & Shipfitter Industry Pension Trust (Client) in the review and evaluation of its investment policies and objectives. SSB acknowledges that the Trustees of Client are an ERISA fiduciary which is obligated to monitor the performance of its retained investment managers and SSB is being hired to assist the Trustees in fulfilling that monitoring duty.

– Provide promptly after the end of each calendar quarter a written analysis of Client's investment performance based upon information furnished by the Client's custodian and present that information orally to Client. The written report shall, at a minimum, compare the Client's investment performance with the performance targets, and for compliance with Client's investment policy. Private placement investments, including first mortgages, real estate, construction mortgages, insured collateralized notes, private debt non-participating, equity participating mortgages and limited partnerships are not included in this agreement, except to the extent necessary for evaluating Client's overall investment performance.

– The fee for the consulting service provided by SSB is as follows: $10,000 McMorgan, $10,000 Quest and $15,000 Capital Consultants. The fee for any period which is less than a full calendar quarter, either at the commencement or termination of this Agreement, shall be pro-rated on a per diem basis. If either SSB or Client terminates this Agreement, a pro-rata refund of the consulting services fee will be made, from the date of termination through the end of the billing period.

– The fee does not include brokerage commissions or other transactional charges, or any fees of charges of any affiliated or unaffiliated Advisor retained by Client or SSB.

– This agreement shall continue on a month-to-month basis until terminated by at least 30-days advance written notice to the other party.

– SSB will hold any non-public information it receives about Client in confidence and will not disclose any such information to any third party, except as necessary in the performance of its duties, on behalf of the Client, or as required by applicable law.

– This agreement shall be interpreted under and governed by the laws of the State of Oregon. This agreement is the entire agreement between Client and SSB and any other agreement oral or written is merged herein.

Habermeyer Decl. Exs. 41, 44.

Zalutsky reviewed the Agreements and told the trustees that "this investment monitor [SSB] was not monitoring, quote, private placements. It would generally be monitoring publicly-traded assets." Zalutsky Dep. at 67-68.

Fullman thought the Agreements memorialized the scope of services that SSB was already providing. Fullman Dep. at 118. Chambers agreed that the agreement reflected the scope of services SSB had been providing during the previous five years he was assigned to the account.

Many trustees had never read the Agreements or were not aware of the details. Stahly Dep. at 131, Scovill Dep. at 98. One trustee's opinion on the scope of SSB's duties was based on the kind of company SSB is and the scope of the business the company had. Stahly Dep. at 178.

III.     The Report Format

The first quarterly report stated on the cover:

> This investment evaluation is directed only to the client for whose account the evaluation was created. The underlying data has been obtained from sources considered to be reliable: the information is believed to be accurate but there is no assurance that it is so. This evaluation is for informational purposes only and is not intended to be an offer, solicitation, or recommendation with respect to the purchase or sale of any security or a recommendation of the services supplied by any money management organization.

Habermeyer Decl. Ex. 14 (March 31, 1990 report). The reports measured the performance of the assets and compared it to performance targets and industry benchmarks. There are charts and graphs illustrating asset allocation, rates of return by type of asset, changes in value, time-

weighted rates of return, and comparisons with benchmarks such as the Standard & Poor 500

Index and United States Treasury bills. Some later reports include a Fiduciary Compliance

Report which looks at the investment objective, allocation, sector weighting, and stock holdings

down 25% or more. Habermeyer Decl. Ex. 29 at 7. In every quarterly report, SSB reported on

the total Pension Plan portfolio, including private investments managed by CCL. The private

investments were included in the asset allocation of all investments in the Plan.

In 1990 and 1991 only, SSB also provided a separate real estate report with the same

disclaimer on the cover. The report showed the rates of return on the real property, based on

appraisals in the custodial statements. The report also notes a difficulty in understanding the

appraisals as reported by the custodian, with an inability to match changes in market values with

either changes in appraisal or draws for the buildings under construction. Included in the

discussion is the sentence, "After the change in custodians, any changes in value were simply

reported to First Interstate directly from the manager, Capital Consultants." The report is fairly

brief, having two graphs of the properties' performance, a chart of rates of return compared to

some benchmarks, and a chart of time-weighted rates of return. Habermeyer Decl. Ex. 16

(June 30, 1990 report). From the first quarter 1992 and after, SSB included the real estate assets

in the main quarterly reports along with the other assets. The format of the quarterly reports

changed over the years. From the third quarter 1995 to the first quarter 1997, SSB reported on

the real estate assets in a section titled "CCI–Private Placements." After that, the reports showed

the performance of the real estate assets as one of the categories of assets considered together.

Hutchinson Decl. Exs. 34, 41.

The quarterly report for the fourth quarter 1994 contains a full page with the following statement:

Mortgages and Non-Traditional Investments

Consulting Group does not analyze the non-traditional securities held by the Plumber, Steamfitter, & Shipfitter Union accounts. These include the Collateralized Mortgages, Conventional Mortgages, Participating Mortgages, and Private Placements. We do not have the expertise to review these investments. Our work consists of recording the cash flow received as reported by First Interstate Bank and including those amounts in our calculations of the total return for the Union portfolio.

In the past, First Interstate Bank has reported a difference in the total asset values of some of these investments from the values reported by Capital Consultants. It was expected that these differences were to be resolved by the end of the fourth quarter; however, there are still unresolved differences.

Habermeyer Decl. Ex. 29 at 15.

Zalutsky recalls Haslett's discussion of this statement with the trustees:

Q. What do you recall Bonnie Haslett saying to the Local 290 trustees about the disclaimer in the Smith Barney reports?

A. She would say that, we weren't responsible to monitor the private placements.

Q. Do you recall how many times she made that statement to the trustees?

A. No.

Q. Was it more than once?

A. I believe so.

Q. Was there ever any disagreement with her statement when she made it to the trustees?

A. Not to my recollection.

Q. And was her statement consistent with your understanding at the time of the services that Smith Barney was providing?

A.  Yes

Zalutsky Dep. at 80.

Statements to this effect were included in each quarterly report through CCL's collapse in the fall of 2000.  At least as of the first quarter 1995, the reports contained the statements, "The information contained in the accompanying reports are collected from sources believed to be reliable."  By the third quarter 1995, the disclaimer was expanded to, "The information contained in the accompanying reports was collected from sources believed to be reliable, but we do not guarantee its accuracy or completeness."  Another warning was added beginning in the first quarter 1997:

> Due, in part, to the timing of income deposits to Wells Fargo Bank, there will continue to be slight market value differences between the custodian and investment manager.  Please note that the Consulting Group uses information directly from the Wells Fargo custodial statement in calculating its returns for the UA Local #290 portfolio.  We will use these values and only these values in our calculations unless specifically instructed otherwise by the trustees.

Habermeyer Decl. Ex. 30 (containing the pertinent pages of the reports from the first quarter 1995 through the first quarter 2001).

Plaintiffs provided a summary exhibit which compares the CCL portfolio summary with the SSB quarterly report values for December 1995 through June 2000.  Hutchinson Decl. Ex. 58.  The totals for the Pension Plan differ by amounts ranging from approximately $200,000 to over $6 million just prior to CCL's collapse.  There is no evidence, however, that SSB took the valuations it used from anywhere except the custodian's statements unless the trustees directed otherwise.  In particular, there is no evidence that SSB was the source of the valuations.  For example, in the third quarter 1996 report, it states:

On September 19, 1996, the trustees of the UA Local #290 Pension Plan met to resolve cost and market value issues over assets managed by Capital Consultants, Inc. Subsequent to that meeting, the trustees instructed the custodian and investment manager to use the following cost basis and fair market values retroactive to December 31, 1995. The Consulting Group has used these figures in its rate of return calculations beginning with that date. Capital Consultants began using the revised figures as of August 1996, while the custodian did not reflect these figures until the October, 1996 statement.

Habermeyer Decl. Ex. 77 at 32.

Beginning in 1994, the quarterly reports contained text sections titled "Consulting Group Outlook" and occasionally "Capital Markets Commentary." The sections discussed general market trends by sector, both past and future, and gave general opinions such as in the Value and Growth Stock Sectors discussion, "[c]ontinued tilt toward value (60% 70%) relative to growth (30% 40%)." Advice concerning the purchase, holding, or sale of specific investments was not given. Hutchinson Decl. Exs. 28, 34.

Many trustees had never read any of the disclaimers and were unaware of them. The financial data was presented to them at meeting but they never read a quarterly report cover to cover. Stahly Dep. at 122-23, Fullman Dep. at 113, Scovill Dep. at 92-93, 98, Gormley Dep. at 121-22, Clendenin Dep. at 205-06.

Although I have many exhibits with many quarterly reports for both the Pension Plan and the 401(k) Plan, most of the exhibits have selected pages from the reports. Thus, I have not been able to make a page to page comparison. As far as I am aware, there were no significant differences in the reports for the two different plans.

IV.    SSB's Conduct

In 1994 and 1995, SSB and Zalutsky assisted the trustees in revising the Pension Plan's investment guidelines.  SSB provided a questionnaire, compiled the responses, and gave the compilation to the trustees.  Haslett sent a revised summary of the investment policy, a three page document of guidelines plus four single page addendums, one for each investment manager, for the trustees to fill in the maximum and minimum percentage invested in different classes of investments.

On August 9, 1994, Scott wrote Westcore Cash Reserve Money Market Fund, identifying himself as a consultant to the Pension Plan.  He stated:

> [W]e are requesting information as to what percentage of the Westcore funds are in derivatives.
>
> As spelled out almost daily in the financial press, derivatives involve the creation and utilization of unique and sometimes exotic structured products.  The trustees would like to be informed of any risks, if any associated with this money market fund.

Hutchinson decl. Ex. 5.

Warnock testified that when Haslett noticed a difference in 1994 between CCL's reports and the custodian bank's reports for the valuations in real estate investments, "she [Haslett] didn't like the valuations that she was seeing and she asked us to get an independent person in to evaluate the properties."  Warnock Dep. at 126.

In April 1997, SSB employee David Hennessy sent a letter to the Hawaii Sheet Metal Workers about CCL's collateralized note investments and copied the letter to Chambers.  Hennessy did not advise the plan to refrain from committing funds but wanted the plan to understand several points prior to making a decision:  (1) the type of lending was usually

conducted by banks in a factoring program and is perceived to be a high credit risk; (2) the plan

should make sure it understands the insurance process for paying off a delinquent loan because of

their high risk nature and because the current economic situation, without a recession in years,

did not accurately reflect hard economic times which could have a very negative impact on this

type of investment; (3) legal counsel should be consulted to determine the cost of collections,

which could be a significant expense; (4) there are other forms of high yield investments with

similar risk, more liquidity, and possibly similar returns that should be considered, particularly

high yield bonds held to maturity; (5) the perceived low volatility is questionable and the

investments are not liquid; and (6) the 11% return net of fees is 8% and an economic downturn

coupled with collection expenses would greatly reduce the net return.  Ashworth Decl. Ex. 14.

SSB inserted warnings into some of the quarterly reports.

The second quarter 1996 report states:

On August 18, 1996, our office received a revised performance review
from CCI.  We noted at this time the Smith's Company Real Estate Holdings
(SCREH), LLC value had been written back up to 6,000,001.04.

Please note that the [sic] prior to this date, CCI had valued this limited
partnership at zero (please see following letter to Dick Layne dated June 13, 1996,
from Linda Lucas).  It is our understanding that the trust will be setting some kind
of a market value adjustment at a later date at which time the performance
numbers can be adjusted accordingly.

Again, I would like to remind the trust that our work consists of recording
cash flows and recording bank valuations only.  We do not claim the expertise
necessary to review such investments.

Habermeyer Decl. Ex. 19 at 4.

The first quarter 1997 report stated, "Based on continued underperformance relative to

the benchmark, Consulting Group recommends that an investment manager search be conducted

for the $16 million in equities that Capital Consultants currently manages."  Hutchinson Decl.
Ex. 40 at 40424.

The first quarter 1997 report stated that three particular loans violated "specific
instructions from the trustees regarding the addition of new non-traditional assets to the Trust
portfolio" and reminded that prior approval had to be obtained from the trustees before any such
transaction was initiated.  The report also noted that per the guidelines, CCL was overweighted in
private placements due in large part to the three loans but that since the quarter ended, the
amount had dropped and was within the guideline.  Habermeyer Decl. Ex. 108 at 30.

The second quarter 2000 report stated when discussing the balanced fund investments,
"Manager has under performed on a 3 year and 12 month basis."  The same report also stated:
(1) "Collaterized [sic] notes = $145,004.69.  On 06/30/00 purchased $50,000 Beacon in which
the bank does not record.  Asset allocation for collaterized [sic] notes would be 15.78% after this
addition." (2) "Corporate obligations maximum exposure 40% as of 6/30/2000 = 50.20%." and
(3) "Maximum exposure for Collaterized [sic] Notes = 15%.  16.06% in Trustee Directed."
Hutchinson Decl. Ex. 90 at 34097, 34099, 34100.

V.     The Trustees' Expectations

Plaintiffs cite to several instances of trustees' testimony to support their argument that
SSB was an ERISA fiduciary and had a special relationship with the Plans.

> [W]hat tremendous fiduciary responsibility [SSB] had to the participants and to
> the trustees. . . . They had responsibility to analyze and provide us with
> information and be the ultimate answer for any decisions on dealing with these
> investment managers and their portfolios.

Gormley Dep. at 112.

Q. What led you to believe that Smith Barney was providing advice to the plans on the appropriateness of Capital as an investment manager?

A. It's the scope – that's part of the full scope of services that an investment monitor provides.

Scovill Dep. at 134.

[T]hey were hired as the watchdog oversight monitor for the money managers, that they were there to ensure that we observed our investment guidelines, to aid the trustees in performing their fiduciary obligations, to raise questions or concerns in the event there was any impropriety or suspicion that valuation was not in the portfolio or with any particular manager.

Clendenin Dep. at 165.

Q. When you say that you believed Ms. Haslett looked at the value of a particular investment, what do you mean by looked at the value?

A. She would have to – I don't know what her process was, how she managed to arrive at her conclusions or the figures that were in the report. It was just a sense, just a feeling that I had because she was an investment monitor and I relied on her to monitor the manager and give us information relating to the manager.

Stahly Dep. at 170.

Q. Okay. And is it correct that Smith Barney was being hired to assist the trustees in fulfilling the monitoring duty?

A. That's true, they were hired to do that.

Fullman Dep. at 122.

Q. So is what you are telling me that you can't remember how you got the understanding that Smith Barney was hired to make reports to the trustees, to monitor the money managers, and to advise the trustees of where to put the money with different money managers?

A. I just believe that was their duty, their fiduciary duty and that was their job I believe.

Morey Dep. at 81.

It was my understanding that Bonnie would be watching the investment managers, taking their reports, comparing them with the custodian reports, comparing them with the audits and the accounting reports to make certain that everybody was telling me the truth and making certain that our investments were conforming to our portfolio, were conforming to our policy guidelines.

Warnock Dep. at 187.

Q. Okay. And the next sentence [of the Agreement] says, The agreement specifically excludes the review of the private placements. Do you see that?

A. Yes, I do.

Q. Do you recall getting this information from Mr. Zalutsky at or about November 30 of 2000?

A. I don't remember specifically getting this. I would have to say that, if I read this, it wouldn't mean a thing to me.

Q. Why is that?

A. Because prior to and subsequent to all this happening, Smith Barney continued to make exactly the same reports. They never raised the question about private placements, they never raised any questions about the inadequacy of their firm and not being able to monitor something. We assumed that they were monitoring everything, and, again, I would reiterate that if we knew that $58 million was not being monitored because they didn't know how to do it, we would have reacted. I can guarantee it.

Fullman Dep. at 184-85.

Q. . . . Did you ever become aware that a contract existed between Smith Barney and the plan in which Smith Barney stated that it did not include the private investments of the plan in its analysis?

A. I can't see how they would be able to perform their function as an investment monitor and not review those kinds of things.

Stahly Dep. at 131.

VI.     Trustees' Conduct and other Statements of their Expectations

Plaintiffs agree that the trustees never asked nor expected SSB to perform appraisals of the collateral underlying the private investments. None of the trustees (Stahly, Gormley, Clendenin) or the service provider (Zalutsky) who were asked at deposition could recall SSB's ever being asked to value the collateralized notes, to assess the creditworthiness of any borrower, or to render an opinion as the adequacy of the collateral.

The trustees never gave SSB any discretion to buy or sell plan assets. Gormley Dep. at 133. SSB did not recommend specific investments:

> Q. Did Smith Barney ever recommend that any of the Local 290 plans ever make any specific investment?
>
> A. I think the answer to that question has to be they not only didn't recommend investments to make, nor did they recommend investments to sell or change any. Their job was to tell us what the investments were doing, and that's all they were supposed to do.

Fullman Dep. at 94.

> A. No. And I would have been surprised if Smith Barney did make recommendations on investments the money manager shouldn't be involved in. I don't perceive that to be part of their responsibility, to make recommendations on how to invest trustee money. That was the business of the money manager.

Clendenin Dep. at 222.

> Q. Do you recall any representative of Smith Barney recommending to the 401K plan to buy a private placement?
>
> A. I don't recall Bonnie or Smith Barney advocating any individual purchase of any financial instrument.
>
> Q. Do you recall Ms. Haslett or any representatives of Smith Barney ever recommending to the trust to sell any individual investment?
>
> A. I don't recall.

Q.  Do you recall any representative of Smith Barney recommending to the trust to hold a specific investment?

A.  No, I don't recall.

Q.  Did the trustees ever ask Smith Barney to evaluate the collateral or the creditworthiness of the borrowers underlying the private placements, to your knowledge?

A.  I don't recall that, either.

Warnock Dep. at 194-95.

The trustees did not expect SSB to appraise the real property investments:

Q.  And in the largest paragraph [in a letter sent to the Plans], under the table, it lists where the values are coming from, right?

A.  That's correct.

Q.  And these are the values that you expected to be reported in the annual report as of December 31st, 1997, to your participants.  Correct?

A.  That's correct.

Q.  And you expected Smith Barney to rely on these valuations in judging the performance of the managers.  Correct?

A.  Yeah, that's correct.

Fullman Dep. at 21.

Q.  At any time when you were on the board of trustees of the Local 290 plans, did you ever ask Smith Barney to do appraisals of any real property that the plan had invested in?

A.  I think the answer is no.

Q.  Did you ever ask Smith Barney to appraise any of the real estate that was securing any loans that the trust had made?

A. Smith Barney's responsibility was to summarize and report to us and make sure that we knew what was going on, but I don't remember Smith Barney ever running out and making appraisals.

Q. You never asked them to do that?

A. Never asked them to do that.

. . . .

Q. And were you relying on Norris Beggs & Simpson to provide you with a value that you could assign to the Smith's Home Furnishing stores?

A. Yes, I was.

Fullman Dep. at 92, 163.

A SSB representative was present at some of the trustees' meetings during which major decisions about CCL investments were discussed or decided. For example, in August 1993, Scott was present at the meeting in which CCL asked the trustees to authorize investments in collateralized notes, even though Fullman states that SSB did not recommend that the trustees participate in that type of investment. Habermeyer Decl. Ex. 47 at 3; Fullman Dep. at 123. Likewise, Haslett was present in July 2000 when the trustees decided that no further investments or reinvestments should be made in any CCL private placements or real estate. Habermeyer Decl. Ex. 40.

The trustees made numerous major decisions about CCL investments, however, in meetings with no SSB representative present. In 1992, the trustees removed their previous restriction which had prohibited CCL from developing the Tech II real estate project. Habermeyer Decl. Ex. 49. In 1994, the trustees decided to approve a $7 million investment in Capital Credit and limit the collateralized notes investments. Habermeyer Decl. Ex. 51. In 1996,

the trustees decided to rescind their earlier decision to phase out the collateralized notes

investments and allow CCL to resume investing in them. Habermeyer Decl. Ex. 50. In 1998, the

trustees decided to discontinue any further investments in loans to Wilshire Credit. Habermeyer

Decl. Ex. 112. In 1999, the trustees decided to release the $6.2 million expected from the sale of

the Capital Credit debentures and invest to reduce the debt on the former Smith Buildings.

Habermeyer Decl. Ex. 57. There is no evidence that SSB took part in these decisions.

In 1999, CCL informed the trustees that it sold the Wilshire Credit investments to

Sterling Capital. None of the trustees remember asking SSB to take any action with respect to

this change or receiving any advice from SSB about the change. Habermeyer Decl. Ex. 5,7, 8,

22, 48, 53.

The trustees retained consultants other than SSB to evaluate and manage the real estate

investments. In December 1997, the trustees retained Courtland Partners, Ltd. to provide

evaluation services for the Gresham Square Shopping Center, one of the CCL private loan

placements. Habermeyer Decl. Ex. 37. In March 1999, the trustees retained American Realty

Advisors to provide preliminary real estate investment management services. Habermeyer Decl.

Ex. 38. In July 2000, the trustees agreed to retain a real estate consultant and a real estate

attorney to review and analyze all trust real estate investments. The trustees also agreed to retain

Bruce Korter as a pension trust consultant to analyze the Legends project. Habermeyer Decl. Ex.

40.

On May 24, 1995, Layne wrote Fullman to report a problem with the valuation of the real

property, namely, that the appraisals were too old. The Plans then asked CCL for a schedule of

appraisals and whether they would be performed by an MAI appraiser. The letter also stated:

> The Board has also adopted a new procedure when there is going to be a market value change in non-publicly traded investments. The new policy is that any market value change of a non-publicly traded investment is to be sent to the Trustees so that they may review your recommended change prior to its being communicated to the Custodial Bank.

Habermeyer Decl. Exs. 59, 60, 61. On September 19, 1996, the Plans passed a motion to implement procedures recommended by a special committee studying various valuation issues. In part, the Plans adopted fair market valuations for the real estate as established by Layne and authorized Norris, Beggs & Simpson to retain an appraiser for the Smith LLC properties as they were leased. Habermeyer Decl. Ex. 62.

According to Fullman, "Layne was charged with testing all of our accounts, making sure that we had an account named ABC, that it was really there. He had the responsibility of going to each of the money managers and verifying that the funds were in place." Similarly, Layne's audit obligations included making sure real estate values were reported on the Plans' financial statements in accordance with accounting rules. Fullman Dep. at 90, 258. Layne reported to the trustees that he did not have the expertise to value the private placements and asked for a policy on how to show them on the financial statements. The trustees instructed Layne to carry them at the face value of the obligation, reduced by any principal payments. Layne Dep. at 127-28.

In the late summer of 1996, 1997, and 1999, Layne provided the trustees with the current market value of the real estate. The trustees then would vote to adopt the values for the Plans' financial statements. Habermeyer Decl. Exs. 78, 80, 81, Zapparoni Decl. Ex. 12.

VII.    PCA Report

Beginning in 1992, SSB provided performance measurement services to the Oregon Hospitality Services Pension Trust ("Hospitality"). CCL was Hospitality's investment manager.

In 1995, Hospitality retained Pension Consulting Alliance ("PCA") to review the CCL private investments.

On February 21, 1996, PCA copied Chambers on a fax PCA sent to CCL asking questions about the Crossings private investment, CCL's exchange of Hospitality's interest in real property for shares of a new company with questionable assets, and the conflict of interest in doing so. Ashworth Decl. Ex. 46. The conflict of interest was discussed two days later at Hospitality's trustees meeting, with Chambers and Haslett in attendance.

A June 18, 1996 draft version of PCA's report was attached to the June 18 Hospitality's trustees meeting at which it was discussed. Chambers and Haslett were not present at this meeting but they received a copy of the minutes and the attached draft report. The PCA report noted several problems, including: (1) CCL's files were incomplete and in poor condition; (2) CCL had a conflict of interest between two of its clients who had varying positions as creditors on a loan; (3) Hospitality's portfolio with CCL had several characteristics not generally present in institutional portfolios which increased the risk by exposing the assets to value or income erosion; (4) CCL's valuation methodology had several problems; (5) the problems with the Crossings were confirmed; (6) the Palms investment value was overstated; and (7) CCL did not use industry standard "as-is" real estate appraisals. Ashworth Decl. Ex. 49. Based on the PCA report, Hospitality's trustees voted to refrain from making any further private placement investments and have an orderly liquidation of the present private investments in the "easiest, fastest, and most equitable way possible to the Trust." Ashworth Decl. Ex. 50 at 87136.

# LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

# DISCUSSION

In their Third Amended Complaint, plaintiffs file seven state common law claims for breach of contract and various torts and three alternative claims for ERISA violations.

I.     Contractual Claims

SSB moves for summary judgment against plaintiffs' two contractual claims. Although logically, the question of whether SSB is an ERISA fiduciary should be addressed prior to considering plaintiffs' common law claims, I will discuss the contractual claims first. This allows me to explain how I interpret the Agreements, the cornerstone of the relationship between the parties.

A.     Breach of Contract

In the breach of contract claim, SSB contends that it did not breach any specific term of the Agreements because the Agreements did not obligate SSB to analyze plaintiffs' private investments and advise plaintiffs of problems with those investments.

Plaintiffs contend that the Agreements required SSB to: (1) assist in the review of plaintiffs' investment plans and objectives; (2) assist plaintiffs' trustees in fulfilling their fiduciary duty to monitor the performance of plaintiffs' retained investment managers; and (3) provide analyses of the Plans' investment performance, including an analysis of the Plans' private placement investments to the extent necessary to evaluate the Plans' overall investment performance. Based on that language, plaintiffs contend that SSB unambiguously agreed to provide plaintiffs' trustees with monitoring advice regarding CCL's competence as an investment manager for all categories of plaintiffs' assets, and further agreed to analyze plaintiffs' private investments to the extent necessary to evaluate plaintiffs' overall investment performance. Because SSB interprets the Agreements differently, plaintiffs argue that the Agreements must be ambiguous and summary judgment cannot be granted dismissing the breach of contract claim.

Under Oregon law, the construction of a contract is a question of law for the court. Anderson v. Divito, 138 Or. App. 272, 277, 908 P.2d 315 (1995). The court's goal is to give effect to the intention of the contracting parties. Anderson v. Jensen Racing, Inc., 324 Or. 570, 575-76, 931 P.2d 733 (1997); ORS 42.240 (in the construction of a written instrument the intention of the parties is to be pursued if possible)).

"To interpret a contractual provision, . . . , the court follows three steps. First, the court examines the text of the disputed provision, in the context of the document as a whole." Yogman v. Parrott, 325 Or. 358, 361, 937 P.2d 1019 (1997). "If the provision is clear, the analysis ends." Id. "When considering a written contractual provision, the court's first inquiry is what the words of the contract say . . . . To determine that, the court looks at the four corners of a written contract, and considers the contract as a whole with emphasis on the provision or provisions in

question.  The meaning of disputed text in that context is then determined.  In making that determination, the court inquires whether the provision at issue is ambiguous.  Whether terms of a contract are ambiguous is a question of law.  In the absence of an ambiguity, the court construes the words of a contract as a matter of law."  Id.  (quoting Eagle Industries, Inc. v. Thompson, 321 Or. 398, 405, 900 P.2d 475 (1995)).

A contract or term is unambiguous if it has only one sensible and reasonable interpretation.  D&D Co. v. Kaufman, 139 Or. App. 459, 462, 912 P.2d 411 (1996).  For a contract or term to be legally ambiguous, it must be susceptible to at least two plausible interpretations when examined in the context of the contract as a whole.  Moon v. Moon, 140 Or. App. 402, 407, 914 P.2d 1133 (1996).

If the contractual provision at issue is still ambiguous after examining the text and its context, the second step "is to examine extrinsic evidence of the contracting parties' intent." Yogman, 325 Or. at 363.  In determining whether an ambiguity exists, the court may consider parol and other extrinsic evidence.  Moon, 140 Or. App. at 407; see also Adams v. Knoth, 102 Or. App. 238, 243-44, 794 P.2d 796 (1990)("[i]n deciding if the language of a contract is ambiguous, it is proper for the court to consider extrinsic evidence regarding the circumstances under which an agreement was made or to which it relates.").  The parties' "practical construction of an agreement may hint at their intention."  Yogman, 325 Or. at 364.

If the first two analytical steps have not resolved the ambiguity, the court proceeds to the third and final analytical step:  the use of "appropriate maxims of construction."  Id.  This can includes the rule that the terms of a contract are construed against the drafter of the language. Hoffman Construction Co. v. Fred S. James & Co., 313 Or. 464, 470, 836 P.2d 703 (1992).

Presumably, if the language is still ambiguous, then what the parties intended by that language is to be decided by the trier of fact. See Oregon School Employees Ass'n v. Rainier School District No. 13, 311 Or. 188, 194, 808 P.2d 83 (1991) ("[i]f [contract terms] are ambiguous, then the trier of fact is to ascertain the intent of the parties and construe the contract consistently with their intent."); Yogman, 325 Or. at 364.

I will repeat the relevant terms of the Agreements for convenience:

Salomon Smith Barney Inc. (SSB) shall:

– Assist the United Association Union Local No. 290 Plumber, Steamfitter & Shipfitter Industry Pension Trust (Client) in the review and evaluation of its investment policies and objectives. SSB acknowledges that the Trustees of Client are an ERISA fiduciary which is obligated to monitor the performance of its retained investment managers and SSB is being hired to assist the Trustees in fulfilling that monitoring duty.

– Provide promptly after the end of each calendar quarter a written analysis of Client's investment performance based upon information furnished by the Client's custodian and present that information orally to Client. The written report shall, at a minimum, compare the Client's investment performance with the performance targets, and for compliance with Client's investment policy. Private placement investments, including first mortgages, real estate, construction mortgages, insured collateralized notes, private debt non-participating, equity participating mortgages and limited partnerships are not included in this agreement, except to the extent necessary for evaluating Client's overall investment performance.

– This agreement shall be interpreted under and governed by the laws of the State of Oregon. This agreement is the entire agreement between Client and SSB and any other agreement oral or written is merged herein.

Habermeyer Decl. Exs. 41, 44.

I first note the integration clause. Moreover, Fullman and Chambers both testified that the Agreements memorialized the scope of services that SSB was providing prior to execution of

the Agreements. Thus, the extent of the contractual relationship is found in the written Agreements.

Briefly put, SSB agreed: (1) to assist the Plans and trustees in reviewing and evaluating their investment policies and objectives; (2) to assist the trustees in monitoring the performance of its retained investment managers; and (3) to provide a quarterly report. Private investments are only included in the Agreements "to the extent necessary for evaluating client's overall investment performance." To determine if the language is ambiguous, I may examine extrinsic evidence for assistance in determining the parties' intent.

I first turn to two documents on which plaintiffs rely greatly – the Lewis and Clark document and Chambers' letter of September 10, 1994. Both are clearly marketing documents and do not support the broad interpretation of the Agreements which plaintiffs propose. Chambers' letter was written when he was attempting to keep Scott's former clients with SSB after Scott left. The Lewis and Clark document describes broad goals and objectives for the relationship between a client and investment management consultant. It is not directed at the trustees in any way and could have been sent to any of SSB's clients. SSB's Consulting Group has five service levels available. Naturally, it would attempt to move clients from the service levels which charge the least fees to ones which charge higher fees. The Lewis and Clark document describes some of the more expensive service levels, as explained by Ward. But there is no evidence that the trustees ever engaged SSB to provide the greater level of service. For the same reason, the unexecuted Draft Statement of Investment Policy Objectives and Guidelines Haslett distributed to the 401(k) Plan is unpersuasive as a basis to expand SSB's contractual duties.

Turning to other evidence of the parties intent, the record shows that Haslet stated more than once, without objection by the trustees, that SSB was not responsible for monitoring the private investments. The trustees attorney informed them that SSB was not monitoring the private investments. The trustees never asked and never expected SSB to appraise the collateral underlying the private investments. The quarterly reports all contain disclaimers that there is no assurance that the underlying data is accurate and that the report is not a recommendation of the services supplied by any money management organization. The quarterly reports informed the trustees when a type of investment, including private investments, was more heavily invested than allowed by the guidelines. Numbers for the entire plan portfolio, including private investments, were reported and various statistics were generated. There is no evidence that the trustees ever complained about the data or service which SSB provided.

I cannot interpret the Agreements' language as broadly as plaintiffs, that SSB unambiguously agreed to provide the trustees with monitoring advice regarding CCL's competence as an investment manager for all categories of plaintiffs' assets. I also conclude that the language is not ambiguous because plaintiffs' interpretation is not a plausible one. For SSB to provide that advice, it would have to investigate the underlying collateral. Neither the Agreements nor the extrinsic evidence show that SSB was retained to do so.

Accordingly, I grant summary judgment in favor of SSB and dismiss the breach of contract claim.

B.      Breach of the Implied Covenant of Good Faith and Fair Dealing

SSB also moves for judgment against the breach of the implied covenant of good faith and fair dealing.  SSB argues that Oregon law does not permit plaintiffs to alter the express terms of a contract through the use of the implied covenant.

Plaintiffs contend that to analyze this claim, the court must consider SSB's conduct in light of plaintiffs' objectively reasonable expectations.  To do this, plaintiffs contend the court must consider industry standards and practices.  Plaintiffs argue that SSB violated industry standards and practices by not acting solely in the interest of the client because of the conflicts of interest, by using CCL's valuations without explaining to plaintiffs that the valuations created the false appearance that the investment was performing well or that the numbers were not from reliable sources, and by failing to provide the trustees with sufficient information to fulfill their consulting responsibilities.

SSB contends that industry standards, or a party's expectations, are irrelevant if the parties have agreed to an express term governing the issue, as is the case with the Agreements.

Every contract contains an implied duty of good faith.  Uptown Heights Associates v. Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639 (1995).  The duty is applied in a manner to effectuate the objectively reasonable contractual expectations of the parties.  The duty of good faith cannot serve to contradict express contractual terms, even for "an unpleasantly motivated act that is expressly permitted by contract."  Id. (internal quotation omitted).

I agree with SSB, the Agreements expressly and clearly state SSB's duties.  Plaintiffs' expectations, as explained above, go beyond the contractual terms.  With SSB limited to these contractual duties, the conflicts of interest of which plaintiffs complain do not come into play as

they might if SSB had broader duties or a fiduciary relationship, which it did not as discussed below. SSB did all that it could, at its retained service level, to explain that the private investment valuations might not be accurate. It disclaimed any accuracy. The trustees did not retain SSB to ferret out the truth.

Plaintiffs have failed to raise a factual issue that SSB breached its duty of good faith. Thus, I grant summary judgment in SSB's favor and dismiss the claim for the breach of the implied covenant of good faith and fair dealing.

II.    ERISA Fiduciary

The parties filed cross motions on whether SSB was an ERISA fiduciary.

A.    Public versus Private Investments

SSB argues that plaintiffs should not be able to seek a determination that SSB was an ERISA fiduciary to the Plans in their entirety, both the public and private investments, because plaintiffs' claims only relate to the private investments. SSB notes that a person is an ERISA fiduciary only as to the assets for which they perform an advisory function and further argues that a party cannot assert a claim for summary judgment on a theory of liability that is not pled in its complaint.

I agree that this action concerns the losses plaintiffs suffered in the private investments. See, e.g., ¶ 66 of the Third Amended Complaint ("Had SSB performed its services as agreed to and in accordance with industry standards, the Plans would have avoided most if not all losses as there would have been a decision to terminate CCL as a manager of private investments and/or to take appropriate steps to reduce or eliminate exposure to private investments."). Thus, any ruling I make on ERISA fiduciary status will be limited to the private investments. I recognize,

however, that there could be evidence about SSB's conduct with the public investments which is relevant to its fiduciary status over the private investments so I will review all of plaintiffs' arguments accordingly.

B.    Statutory Definition of ERISA Fiduciary

Although there are several ways to become an ERISA fiduciary, plaintiffs rely on the one making a person a fiduciary with respect to a plan to the extent "he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." 29 U.S.C. § 1002(21)(A)(ii).

Rendering "investment advice for a fee" is defined by regulation:

(c) Investment Advice.

(1) A person shall be deemed to be rendering "investment advice" to an employee benefit plan . . . only if:

(i) Such person renders advice to the plan as to the value of securities or other property, *or* makes recommendation as to the advisability of investing in, purchasing, or selling securities or other property; *and*

(ii) Such person either directly or indirectly (e.g., through or together with any affiliate) –

(A) [has discretionary authority]; *or*

(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, *and* that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding

> such matters as, among other things, investment
> policies or strategy, overall portfolio composition,
> or diversification of plan investments.

29 C.F.R. § 2510.3-21(c)(1) (emphasis added).

Third-party administrators are not fiduciaries if they "merely perform ministerial functions, including the preparation of financial reports." CSA 401(k) Plan v. Pension Professionals, Inc., 195 F.3d 1135, 1138 (9th Cir. 1999). Accountants, actuaries, and consultants "who perform their usual professional functions in rendering legal, accounting, actuarial, or consulting services to an employee benefit plan are not considered fiduciaries of the plan solely by virtue of rendering such services." Id. at 1139.

In CSA 401(k) Plan, CSA hired PPI to prepare financial reports and perform other third-party administrative services for its ERISA plan. When PPI discovered missing funds had been embezzled by a trustee, it agreed to continue its duties only if the trustee adhered to a repayment schedule and the employee participant account statements contained a statement that contrary to various legal requirements, a portion of the benefits had not yet been received by the trust. When the trustee failed to comply with the repayment schedule, PPI resigned as third-party administrator. Id. at 1137. The court held that PPI was not an ERISA fiduciary because the preparation of quarterly and annual financial reports based on information provided by CSA was a ministerial task that did not give rise to fiduciary liability. PPI's conditions of continued employment did not change this fact because PPI did not exercise actual control or discretionary authority over the trust. Id. at 1139-40.

1.    <u>Rendering Investment Advice for a Fee</u>

Plaintiffs contend that SSB is an ERISA fiduciary under the first part of 29 U.S.C.
§ 1002(21)(A)(ii) because it renders investment advice for a fee.  Plaintiffs contend that they can
prove both prongs of § 2510.3-21(c)(1)(i) as well as § 2510.3-21(c)(1)(ii)(B).

a.    <u>Valuation of Property</u>

I will begin with the first prong of § 2510.3-21(c)(1)(i), that a person renders advice on
the value of securities or other property.

Plaintiffs argue that SSB's quarterly reports in which it gave market values of the Plans'
securities and private investments fall within the DOL's regulation on the meaning of advice to a
plan on the value of securities.  According to plaintiffs, SSB selected values of the investments to
use in the quarterly reports, resolved conflicts between CCL and the custodial bank about the
values, and advised the trustees that they could rely on the values placed on the investments
because they were from sources SSB believed to be reliable.  Plaintiffs claim that SSB also used
its discretion to select values for Smith's Home Furnishing investments after noting that the
Smith's Consolidated Real Estate Holdings Limited Partnership was overstated.

SSB disputes this argument and contends that it never valued any Plan investments
because it based its reports on values provided by other service providers retained by the Plans.
SSB points to the trustee's testimony that they did not obtain advice from SSB about the value of
the Plans' investments, did not expect to receive such advice, and that the values in the reports
were set by the Plans in conjunction with the auditor, custodian, and independent appraisers.
SSB argues that mere reporting of third parties' valuations is not advice to the Plans.  SSB claims
that it did not have discretion to select valuations and, in the case of Smith's Home Furnishing

Investments, the valuations were provided by Norris Beggs, the managing agent for the property. When SSB attempted to reconcile valuation differences, it never attempted to independently ascertain the underlying value itself.

The evidence is undisputed that the trustees never asked SSB to appraise real estate or collateral underlying the private investments. There is no evidence that SSB took valuations from anywhere except the custodian's statement unless the trustees directed otherwise. As an example, see the 1996 third quarter report.[4] SSB reported differences without trying to resolve them. See the 1994 fourth quarter report and the 1997 first quarter report. The reports did not blithely advise the trustees that they could rely on the investment values because they were from sources SSB believed to be reliable, as plaintiffs contend. The same paragraphs also contain the caveat that SSB does not guarantee the accuracy or correctness of the information.

Plaintiffs' arguments are not supported by the evidentiary record. I conclude that plaintiffs have failed to raise a factual issue that SSB rendered advice to the Plans as to the value of securities or other property under § 2510.3-21(c)(1)(i).

b.    Advice on Investing

Plaintiffs contend that they have established the alternative ground that SSB provided advice concerning the advisability of investments, the second prong of § 2510.3-21(c)(1)(i). They note that in 1997, SSB recommended that the Pension Plan conduct an investment manager search for the public equities CCL managed because of continued underperformance. Plaintiffs argue that if CCL was terminated as investment manager, its choice of equities would be sold and

---

[4] In my analysis, when I refer to a particular report, the relevant section is quoted in the Facts section of this Opinion. I will not repeat the quotation here.

the new investment manager would purchase other equities. Because subsequent SSB reports did

not contain this recommendation, plaintiffs argue that SSB essentially endorsed CCL and its

investments in all later quarterly reports.

SSB notes that the recommendation to conduct an investment manager search does not

address the advisability of any specific investments because it did not address whether specific

equity investments were appropriate for the Plan or not. Further, SSB contends that its

recommendation about the equity investments manager is not enough to provide a foundation for

ERISA fiduciary status concerning the private investments because it does not address them.

Concerning the subsequent reports which did not continue to suggest a manager search, SSB

contends that plaintiffs make a broad leap to their argument that the absence of a

recommendation is an endorsement of CCL and its investments in all later reports. SSB argues

that the cases require affirmative investment-specific recommendations to constitute advisability

recommendations, not the absence of a recommendation to divest.

There is no evidence that SSB ever recommended the Plans buy or sell a particular

investment. I agree with SSB that the regulation requires this. See Thomas, Head & Greisen

Employees Trust v. Buster, 24 F.3d 1114 (9th Cir. 1994) (investment advisor who recommended

the purchase of 61 deeds of trust notes was found to be ERISA fiduciary), cert. denied, 513 U.S.

1127 (1995). Plaintiffs have cited no case to the contrary. Their argument that SSB's

recommendation that the trustees conduct an investment manager search for the public equities

CCL managed because of continued underperformance amounts to a recommendation on the sale

of securities is not persuasive. The argument that the new investment manager would purchase

other equities is speculative. Moreover, that would still have the new investment manager, and

not SSB, recommending the sale and purchase of securities. The connection is too attenuated on which to base ERISA fiduciary responsibilities. Accordingly, I conclude that plaintiffs failed to raise a factual issue that SSB rendered advice to the Plans on the advisability of investments under § 2510.3-21(c)(1)(i).

        c.      <u>Regular Advice Serving as Primary Basis for Investment Decisions</u>

If plaintiffs had met their burden to establish one of the two prongs of § 2510.3-21(c)(1)(i), they would also have to establish one of the subparts of § 2510.3-21(c)(1)(ii) because of the conjunctive "and" in the regulation. Plaintiffs contend that they can establish § 2510.3-21(c)(1)(ii)(B).[5] I will also address this issue.

Plaintiffs contend that SSB gave the advice under a mutual understanding that the advice was a primary basis for the Plans' investment decisions because SSB was the only consultant between the Plans and the CCL investments.

SSB argues that whatever plaintiffs claim to be advice did not constitute a primary basis for the Plans' investment decisions. SSB first contends that there was no mutual agreement that any advice from SSB would be a primary basis for investment decisions. SSB also notes that the Plans gave CCL discretion to make and manage all of these investments, and engaged other consultants to assist them with private investment decisions.

---

[5] "(B) Renders any advice described in paragraph (c)(1)(i) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, *and* that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments." 29 C.F.R. § 2510.3-21(c)(1) (emphasis added).

The quarterly reports establish that any advice was given on a regular basis. But there must also be an agreement that the services would serve as a primary basis for investment decisions. Plaintiffs have not raised a factual issue on this point. The record is undisputed that SSB never recommended to buy or sell a specific investment. The trustees also made many decisions concerning significant investments at meetings without SSB present. These include the development of Tech II, a $7 million investment in Capital Credit, allowing CCL to resume investing in collateralized notes, discontinuing further investments in loans to Wilshire Credit. and releasing $6.2 million from the sale of Capital Credit debentures to reduce the debt on the Smith buildings. There is no evidence that SSB was involved in these decisions in any fashion.

I conclude that plaintiffs failed to raise a factual issue that SSB gave advice on a regular basis under a mutual agreement that the advice would serve as a primary basis for investment decisions.

2. <u>Responsibility for Rendering Investment Advice for a Fee</u>

Alternatively, plaintiffs contend that SSB was an ERISA fiduciary under the second part of 29 U.S.C. § 1002(21)(A)(ii) because it had the responsibility to provide investment advice under the Agreements, even if it failed to provide the advice.

SSB contends that the Agreements expressly exclude the private investments from SSB's scope of service and, thus, cannot be the basis for any responsibility on the part of SSB.

For the reasons explained in my contractual analysis above, I agree with SSB that it had no responsibility to provide investment advice under the Agreements.

3. <u>Summary</u>

I want to address the PCA report separately. I first note that circumstances can cause a moral or ethical obligation to arise when no such legal obligation exists.

In <u>CSA 401(k) Plan v. Pension Professionals, Inc.</u>, 195 F.3d 1135, 1138 (9th Cir. 1999), the third-party administrator, PPI, found evidence of embezzlement but did not report it to the participants, who later claimed that PPI had a broad duty to report another fiduciary's management activities that threaten the funding of benefits. The court held that PPI did not fail any duty to report its suspicions of trustee embezzlement:

> However, CSA's argument *presumes that PPI was already a fiduciary* of the Plan (or became one) and therefore had a duty to protect the beneficiaries. While it is true that an ERISA fiduciary has an affirmative duty to inform beneficiaries of circumstances that threaten the funding of benefits, CSA can point to no case holding that *non*-fiduciaries have a similar duty. . . . PPI never did incur fiduciary status because it failed to exercise control or discretionary authority over the Plan, and therefore had no duty to warn the Plan Participants.

<u>Id.</u> at 1141 (emphasis in the original, internal quotation and citation omitted).

Because SSB was not an ERISA fiduciary, and because it did not have a special relationship with the trustees and Plans as discussed below, it had no legal obligation to warn the trustees about CCL shortfalls which were discussed in the PCA document. Moreover, the PCA document contained much less condemning information about CCL than PPI's knowledge of embezzlement by the CSA trustee. In oral argument, SSB's attorney candidly noted that it might have been a good business practice to give some type of warning to the trustees, assuming that the confidentiality owed to PCA could be respected. But he is correct that SSB had no legal duty to do so.

Plaintiffs rely on <u>Thomas, Head & Greisen Employees Trust v. Buster</u>, 24 F.3d 1114 (9th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1127 (1995), in which the court concluded that an investment advisor, Buster, was an ERISA fiduciary under these regulations. As in the case before me, Buster had a relationship of nine and one-half years with the trust. The similarities end there, however. Buster recommended the purchase of 61 deeds of trust notes, virtually the trust's entire portfolio. Buster met frequently with the trust to discuss investment strategy and diversification and the criteria by which the notes would be selected. The trust acted promptly on Buster's recommendations. <u>Id.</u> at 1118-19. Buster gave the trust information "as to the value of the various deed of trust notes by virtue of the yield calculations, mortgage analyses, price information, descriptions of the property, the payor's payment history, and the payor's employment." <u>Id.</u> at 1120. The court concluded that the details related to the value of the notes because they reflected the likelihood that the notes would be paid in full. <u>Id.</u> at 1120. There is no evidence that SSB ever recommended the purchase or sale of a single private investment. Although Haslett and Chambers met frequently with the trustees, they did not provide the depth of advice provided by Buster and the trustees testified that they did not expect them to do so. Thus, <u>Thomas, Head</u> is not persuasive.

Plaintiffs failed to raise a factual issue that SSB was an ERISA fiduciary under either part of 29 U.S.C. § 1002(21)(A)(ii), either because it rendered investment advice for a fee or because it had any responsibility to do so. Accordingly, I grant summary judgment in SSB's favor and dismiss the eighth, ninth, and tenth claims for breach of ERISA fiduciary duties and ERISA co-fiduciary liability for knowing participation and failure to remedy.

II.     <u>Special Relationship Requirement in the Nonintentional Tort Claims</u>

SSB moves for summary judgment on the nonintentional tort claims[6] on the ground that SSB and plaintiffs did not have the special relationship required by those claims. SSB argues that under Oregon law, a plaintiff whose relationship with a defendant arises out of contract may recover for tort claims only if there is a special relationship between the parties. SSB contends that it did not have a special relationship with plaintiffs because in the Agreements, plaintiffs did not authorize SSB to exercise independent judgment on plaintiffs' behalf. Further, SSB notes that the trustees and their counsel all testified that SSB never had the authority or discretion to buy or sell investments, to direct CCL to bring the Plans back into compliance with their investment guidelines, or to base reports on valuations other than those furnished by other service providers.

Plaintiffs argue that a special relationship did exist between them and SSB. They contend that SSB agreed to monitor plaintiffs' investments and money managers and to advise plaintiffs whether CCL was acting properly and should continue as plaintiffs' investment manager or be replaced. Plaintiffs argue that SSB thus undertook fiduciary responsibilities to exercise independent judgment in furtherance of plaintiffs' economic interests. Plaintiffs rely on the same evidence which they contend makes SSB an ERISA fiduciary.

[A] contract details the specific obligations that each party owes the other and, if one party breaches a term of the contract, that breach will result in contract

---

[6] Claim One, professional negligence; Claim two, breach of common law fiduciary duty; Claim Five, negligent retention and supervision; part of Claim Six, negligent misrepresentation; and Claim Seven, common law aiding and assisting the commission of a breach of fiduciary duty. Under <u>Reynolds v. Schrock</u>, 197 Or. App. 564 (2005), a fiduciary relationship is not required for the tort of aiding and assisting the commission of a breach of fiduciary duty of another. Thus, I will not be applying this argument to that claim.

liability.  For tort liability to be imposed, however, a tort duty must exist
independent of the contract and without reference to the specific terms of the
contract.

Conway v. Pacific University, 324 Or. 231, 237, 924 P.2d 818 (1996) (internal quote omitted).

This tort duty has come to be known in Oregon case law as a "special relationship."

The characteristic that makes a relationship "special" is that:

" * * *  In all those relationships, one party has authorized the other to
exercise independent judgment in his or her behalf and, consequently, the party
who owes the duty has a special responsibility to administer, oversee, or otherwise
take care of certain affairs belonging to the other party."

Bennett v. Farmers Insurance Co., 332 Or. 138, 161, 26 P.3d 785 (2001) (quoting Conway v.

Pacific University, 324 Or. 231, 241, 924 P.2d 818 (1996)).  The court is not to focus on the

subject matter of the relationship, "such as one party's financial future," but instead is to focus on

"whether the *nature of the parties' relationship itself* allowed one party to exercise control in the

first party's best interests."  Id. (emphasis in the original).  The type of relationship is determined

by examining all aspects of the relationship, including the contract if one exists.  Id. at 162.

This has been stated more briefly as follows:

To summarize, parties to a contract are in a "special relationship" imposing a
heightened duty of care and thereby creating potential tort liability when one party
delegates to the other the authority to make important decisions with the
understanding that the authority is to be exercised on behalf of and for the benefit
of the authorizer.

Jones v. Emerald Pacific Homes, Inc., 188 Or. App. 471, 478, 71 P.3d 574 (2003).

In a context similar to the one before me, the court found that a factual issue existed on

whether there was a special relationship between a stockbroker and client in Wallace v. Hinkle

Northwest, Inc., 79 Or. App. 177, 717 P.2d 1280 (1986).  Even though the brokerage did not

consider the account to be "discretionary," the client entrusted management of the accounts to the stockbroker and he exercised substantial control over them. The client almost always followed the stockbroker's extensive advice. The stockbroker often bought and sold securities without the client's prior approval. Id. at 181-82.

As explained above, I interpret the Agreements to require a more limited set of duties than what is argued by plaintiffs. SSB never performed appraisals of the collateral underlying the private investments and was never asked to do so. SSB never recommended buying or selling a specific investment. Although SSB recommended replacing CCL as the investment manager for the public investments, SSB did not have the authority to terminate CCL's role. I also do not agree with plaintiffs' argument that recommending replacement of CCL was indirectly recommending the sale of the investments CCL had selected. The connection is much too attenuated. Most importantly, SSB had no discretion to buy or sell plan assets. The trustees gave this discretion to CCL and the other two investment managers. Thus, the trustees did not authorize SSB to exercise independent judgment on behalf of the trustees or the Plans.

Plaintiffs cite Onita for the following language, "In the above relationships [attorney-client, engineers, architects, agent-principal, primary insurer], the professional who owes a duty of care is, at least in part, acting to further the economic interests of the 'client,' the person owed the duty of care." Onita Pacific Corp. v. Trustees of Bronson, 315 Or. 149, 161, 843 P.2d 890 (1992). The statement was made, however, to distinguish an arm's length relationship in which the parties' financial interests are opposed. "In contrast, the present case [sale of land] involves two adversarial parties negotiating at arm's length to further their own economic interests." Id. I

do not think the Onita language can be used to detract from the "exercise independent judgment" requirement in Bennett, a more recent case.

Accordingly, I find that there is no issue of material fact and conclude that SSB was not in a special relationship with the trustees or the Plans. I grant summary judgment against the following claims: Claim One, professional negligence; Claim two, breach of common law fiduciary duty; Claim Five, negligent retention and supervision; and part of Claim Six, negligent misrepresentation.

IV.    SSB's Assistance of Other's Fiduciary Breach

Plaintiffs allege a claim for aiding and abetting CCL's and, in the alternative, the trustees' breach of fiduciary duty based on Granewich v. Harding, 329 Or. 47, 985 P.2d 788 (1999), and the Restatement (Second) of Torts § 867(b) (1979). Plaintiffs argue that the evidence establishes that SSB condoned and tolerated CCL's tortious conduct by failing to report it to the trustees.

Oregon courts have adopted Section 876 of the Restatement (Second) of Torts (1979) which states three ways in which people acting in concert may be held accountable for each other's tortious conduct. Plaintiffs rely only on subsection (b) of section 876:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> . . . .
>
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.

Granewich, 329 Or. at 53.

Plaintiffs contend that the tort also makes a party liable if it knew or should have known of the fiduciary breach. Plaintiffs rely on language in a footnote in <u>Granewich</u> which quotes from <u>IV Scott and Fratcher, The Law of Trusts</u> § 326.4 (4th Ed. 1989):

> ("If a trustee in the administration of the trust employs an attorney or other agent, and the trustee commits a breach of trust, the agent is not under a liability to the beneficiaries of the trust for participation in the breach of trust, unless he knew or should have known that he was assisting the trustee to commit a breach of trust.") That principle is consistent with the rule that lawyers generally are not liable to third parties for acts committed in good faith in performance of their professional activities as lawyers for clients, but that they may not knowingly assist in the commission of a tort.

<u>Id.</u> at 56 n.5. The footnote followed this statement:

> Legal authorities, however, virtually are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby. That principle readily extends to lawyers.

<u>Id.</u> at 56 (footnotes omitted). Although the quotation from the trust treatise does hold a trustee's agent liable when the agent "should have known" of the trustee's breach of trust, when read in context, it is clear that <u>Granewich</u> does not support the proposition that Section 876(b) requires less than actual knowledge. This conclusion is further supported by <u>Bergman v. Holden</u>, 122 Or. App. 257, 260, 857 P.2d 217 (1993), in which the court held that a contractor who hauled timber cut during a trespass was not liable under Section 876(b).

> [T]here is evidence that defendant [contractor] knew that at least some of the logs originated on plaintiff's property. That fact, however, does not change our conclusion that defendant could not be found liable under the *Restatement*. Section 876(b) requires knowledge that the conduct of the other defendants constituted a breach of some duty to plaintiff. That defendant may have known that the logs he hauled came from plaintiff's property or anyone else's is not evidence that he knew that the logs were taken from that property *illegally*. Similarly, the evidence that defendant was related to the other defendants and that he returned the proceeds of the sale to them does not support the inference that defendant knew of their unlawful conduct.

Id. at 260 (emphasis in the original).

I am also aware of the "knew or should have known" language in Aebischer v. Reidt, 74 Or. App. 692, 696, 704 P.2d 531 (1985) (jury question existed on whether passenger was liable under section 876(b)):

> We conclude that a reasonable jury could find from plaintiff's evidence that defendant provided substantial assistance to Smith's negligent driving by continuing to refill the pipe and passing it to him, or knowing Smith would grab it from him, when he knew or should have known that the marijuana would contribute to Smith's intoxication and further impair his ability to drive.

Id. at 696. Because defendant clearly had actual knowledge of the tort, the language is dicta. See also Reynolds v. Schrock, 197 Or. App 564, 107 P.3d 52 (2005) (applying Section 876(b) to make an attorney jointly liable to a third party toward whom the attorney's client, but not the attorney, owes a fiduciary duty if the attorney, *knowing* of the client's fiduciary duty, substantially aids, encourages, or acts in concert with the client in the client's breach of that fiduciary duty). Based on the phrasing of the Restatement section and Oregon case law, I conclude that there must be actual knowledge of the fiduciary breach being assisted.

Plaintiffs point to some specific evidence to support this tort. They claim that the PCA report, along with Hospitality's later divestment, and the Hennessy letter establish that SSB had actual knowledge of CCL's breach of fiduciary duty. Plaintiffs also contend that Chambers was aware that the trustees were breaching their fiduciary duties by failing to properly monitor the CCL private investments.

I first note that there is no evidence or argument that SSB was aware that the CCL private investments had degenerated into a Ponzi scheme.

I will assume that the PCA report indicates conduct on the part of CCL which rises to the level of a fiduciary breach. I will also assume that Chambers and Haslett were aware of its content and were not ethically precluded from disclosing it. The report, however, discusses CCL's relationship with Hospitality and not with the Plans at issue here. Thus, it does not disclose a breach CCL committed against plaintiffs' Plans. Also importantly, the PCA report concerned private investments, which were outside the scope of SSB's engagement as delineated in the Agreements, except for limited purpose of evaluating the overall portfolio's performance. Thus, the PCA report is not adequate to create a factual issue that SSB knew of CCL's fiduciary breach.

Turning to the Hennessy letter, although it raises concerns about the risk involved with CCL's collateralized note program, it does not disclose a fiduciary breach.

That leaves Chambers' testimony that he was aware that the trustees were breaching their fiduciary duties by failing to properly monitor the CCL private investments. Chambers gave the trustees an article from the Department of Labor showing actions against other trusts and encouraged them to get someone else to monitor the private investments. The trustees took his advice and retained Courtland Partners, Ltd., American Realty Advisors, and Bruce Korter to assist them in monitoring the private investments. Because of the warning, Chambers' belief also does not raise a factual issue that SSB knew of CCL's fiduciary breach.

Section 876(b) also requires "substantial assistance or encouragement" for joint liability for the breach of another. In the attorney-client relationship context with the court giving a strict construction to the section, this was analyzed as:

> [U]nder subsection (b), "substantial assistance" or "encouragement" of the client's breach of fiduciary duty would consist of, for example, affirmative conduct that actually furthers the client's breach of fiduciary duty, done by the attorney with knowledge that he or she is furthering the breach.

Reynolds, 197 Or. App. at 576. Even when considered in the best light, plaintiffs' evidence is a far cry from substantial assistance. I find that plaintiffs also fail to demonstrate a factual issue exists on the "substantial assistance or encouragement" requirement. Accordingly, I grant summary judgment against the aiding and abetting a breach of fiduciary duty claim.

V.      Intentional Misrepresentation

SSB moves against the intentional misrepresentation claim for several reasons. I need only address the arguments concerning the nature of the misrepresentation. SSB contends that it had no duty to disclose to plaintiffs matters outside the scope of SSB's limited services. SSB notes that it expressly excluded analysis of the private investments and consistently disclosed that it was not valuing investments but was using values reported by the custodian or trustees. SSB contends that there is no evidence that it misrepresented a material fact on which plaintiffs relied.

To prevail on a fraud claim, a plaintiff must show by clear and convincing evidence:

> (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury.

OPERB v. Simat, Hellisesen & Eichner, 191 Or. App. 408, 423-24, 83 P.3d 350 (2004) (internal quotation omitted). The "right to rely" element requires proof of the reasonableness of the reliance, measured in the totality of the parties' circumstances and conduct. Id. at 428.

Plaintiffs' misrepresentation claim relies on their interpretation of the Agreements, namely that the Agreements contained no limitation on SSB's obligation to fully monitor CCL and to report on its competency. For the reasons explained above, my interpretation of the Agreements results in much more limited duties for SSB than what plaintiffs argue. Plaintiffs contend that SSB's misrepresentations include the disclaimer in the quarterly reports that SSB lacked expertise to analyze private investments. No reasonable jury would interpret the disclaimer as a fraudulent representation. It explains the limitation, an important one, in the services for which the trustees contracted. A disclaimer such as this reasonably acts to prevent reliance which should not be put on SSB's efforts. Similarly, trustees cannot support a fraud claim with the quarterly report disclaimer that the "information is believed to be accurate but there is no assurance that it is so." If anything, SSB was being extra cautious in warning that it had not verified the accuracy of the valuations. Moreover, SSB was following the trustees' instructions to use the custodian bank's values unless expressly ordered by the trustees to do otherwise. Also, there is no evidence that a trustee was aware of the disclaimers at the time. Thus, they could not have relied on them.

Plaintiffs also contend that the special relationship or fiduciary relationship created an affirmative duty to disclose facts that directly threatened the trustees' interests. Because I decided above that the trustees had no special relationship with SSB, SSB was under no obligation to disclose the evidence on which plaintiffs rely to support the fraud claim. This includes the PCA report and the Hennessy letter given to Chambers, which was critical of CCL's collateralized note program.

I conclude that plaintiffs failed to raise a material factual issue that SSB made a false representation or failed to disclose information which it had a duty to disclose. Consequently, I grant summary judgment against the intentional misrepresentation claim.

**CONCLUSION**

SSB's Motion for Summary Judgment or, alternatively, Motion for Partial Summary Judgment (#161) is granted. Plaintiffs' Motion for Partial Summary Judgment re SSB's Status as an ERISA Fiduciary (#170) is denied. Plaintiffs' Motion for Continuance of Summary Judgment to Permit Discovery (#187), Plaintiffs' Motion to Strike Portions of Defendants' Reply to Plaintiffs' Response to Concise Statement of Material Facts and Additional Material Facts (#218), Defendants' Motion to Strike and/or Exclude Late-Filed Supplemental Declarations of Plaintiffs' Experts, Brief Based thereon, and Mendelsohn Affidavit (#226) are moot, as are all other pending motions. This action is dismissed with prejudice.

Dated this ____31st_____ day of August, 2005.


       _/s/ Garr M. King_____
       Garr M. King
       United States District Judge